33 C.C.P.A.(Patents)

### KENYON v. PLATT et al.

Patent Appeal No. 5052.

Court of Customs and Patent Appeals.

Jan. 7, 1946.

Asher Blum and Mock & Blum, all of New York City, for appellant.

I. Seltzer and C. W. Levinson, both of New York City, for appellees.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

BLAND, Associate Judge.

This is an appeal in a United States Patent Office interference proceeding in which the appellant, Kenyon, appeals from the decision of the Board of Interference Examiners in awarding priority of invention of the single count involved to the junior party, Platt and Croft.

The Kenyon application which is here involved was filed August 19, 1939, but Kenyon was awarded and is entitled to, for disclosure of the subject matter, the effec-

tive filing date of his prior application, April 6, 1938, of which said prior application the instant application is a continuation-in-part.

The sole count in the interference is as follows: "A method of dyeing fabrics containing organic derivative of cellulose yarns, which comprises immersing the fabric in a heated bath containing a high temperature dyestuff, withdrawing the fabric from said bath and *maintaining the fabric at substantially the same temperature as the temperature of the heated dye bath while it is out of the dye bath until dyeing is substantially completed."* [Italics not quoted].

The invention relates to a method of dyeing fabrics which are woven from cellulose acetate yarn, cellulose acetate being defined in the count as an "organic derivation of cellulose." One of the fabrics responding to this term is rayon. For cetain reasons it is highly important to use a high temperature dye on this particular kind of cloth and it was found by the parties hereto that a dye known as "Setacyl Discharge Blue G," abbreviated as "Setacyl," was particularly desirable for this purpose. In using this dye, the dyeing temperature of the dye bath ranged somewhat above 167°F.

Many fabrics are dyed under circumstances where a high temperature is required and in dyeing such cloths it is a common expedient to use a dye jig, a part of which is a receptacle or vat in which the dye is placed and heated. As a part of the conventional dye jig such as is used by the parties hereto, and above the vat, is placed a drum upon which there is a roll of cloth to be dyed. The end of this roll of cloth passes down under guide rollers through the dye bath and up to another drum which receives the partly dyed cloth as it passes from the first drum through the dye bath. The length of the piece of fabric may be several hundred yards and the portion of the same in the dye bath at any one time is comparatively small in relation to the entire roll. Through the operation of the rollers the fabric is passed backwards and forwards through the dye bath for a period of time covering from eight to twenty-five hours, or until it is determined that the fabric has been properly dyed. Since in this process the fabric being dyed is on the rolls during the greatest portion of the dyeing period it is conceded by all that most of the dyeing action takes place while the fabric is on the drums.

A problem confronting the dyers of cellulose acetate fabrics with high temperature dyestuffs, when the parties hereto first attempted its solution, was to avoid the uneven cooling of the cloth while on the rolls, which resulted in uneven or streaky coloring, particularly on the edges, or selvages, of the cloth.

The applications of both parties teach that in order to solve the problem the temperature of the dye in the dye vat and the temperature of the fabric on the rolls should be kept *substantially the same* until the dyeing is substantially completed. It became apparent that if a high temperature dye was to be used and that if most of the dyeing occurred on the drums outside of the jig basin it was necessary, in some manner, to maintain the said required temperature of the cloth while on the rolls.

It will be observed that the count is for a method and is very broad in its terms and in no way suggests the means or instrumentality through which the result may be obtained.

█ Platt and Croft, being the junior party by something over two months, were under the burden to prove, by a preponderance of the evidence, their priority of invention.

Both parties took testimony. The preliminary statement of Platt and Croft alleged that they made their first disclosure to others in February, 1938, first written description, first drawing, and beginning of diligence also in February, 1938, and reduction to practice in March, 1938. The preliminary statement of Kenyon alleged that he made his first drawing, first disclosure to others, and began to exercise diligence on March 9, 1938, that he reduced to practice on March 12, 1938, and that he made his first written description shortly before April 6, 1938.

The Board held that the junior party, Platt and Croft, had reduced their invention to practice on March 7, 1938, which the Board said was earlier than appellant's alleged date of conception and that therefore it was unnecessary to consider the Kenyon proofs.

Kenyon had introduced evidence directed at proving that the structure of the device upon which Platt and Croft were held to have reduced the invention to practice on March 7, 1938, was inoperative to perform in accordance with the requirements of the count and to bring about the desired result

necessary under the circumstances. The Board took up this phase of the case and held that appellant had failed to prove inoperativeness. Kenyon also introduced testimony which, without extended discussion, he claims proves a reduction to practice before any date which could be properly awarded to appellees.

The Platt and Croft record consists of the depositions of five witnesses, together with various exhibits hereinafter referred to, which witnesses were all employed by the Celanese Corporation of America, assignee of the Platt and Croft application. Of these witnesses, Herbert Platt, one of the appellees, was a chemist working on quality control of yarns and fabrics and in the first part of 1938 had supervision of dyeing research. Croft, also one of the appellees, was in 1938 and at the time the testimony was adduced superintendent of the dye house of said corporation. Bergeron, relied upon as a corroborative witness, was a chemist in charge of the jig dyers and in 1938 was assistant to Platt in the dye research department. Whitehead, whose testimony in the record is important, was superintendent of research, while Gibbs was chief draftsman of the corporation but early in 1938 was a squad leader in the dye house.

Five witnesses testified on behalf of Kenyon—Kenyon, Curtis, Gould, Morton and Seiferheld. Kenyon was president and part owner of The Kenyon Piece Dyeworks, Inc. Curtis was treasurer and part owner of the company and shared the duties of general manager with Kenyon. Gould was superintendent of dyeing and Morton was a master mechanic for said company. Seiferheld was manager of production for N. Erlanger, Blumgart & Co., Inc., assignee of the Kenyon application.

Appellees and the Board relied for proof of reduction to practice on March 7, 1938, upon the testimony of appellees' five witnesses and certain exhibits which were introduced relating to actions taken from February, 1938, to and including March 7, 1938. One of these exhibits concerning which there was much controversy was Platt and Croft Exhibit 3 of February 22, 1938, being a letter signed by said Whitehead, which seems to be relied upon in part as proof of conception of the invention and to form the basis for subsequent acts shown by other exhibits and testimony in the case, pertinent portions of said exhibit reading as follows:

"Mr. Platt has brought to our attention Setacyl Discharge Blue G as being extremely fast to acid fading. This is a difficult jig color and unless we do something about this, the use of this valuable color will be dropped. Mr. Platt and I have discussed this together and I think that Mr. Platt should take out a research sanction to develop the use of this dye definitely, as it is typical in this respect of many otherwise useful dyes.

"Whilst high temperatures on the jig can produce stretching mechanically, there is no reason why they should do so with suitable treatment. Mechanically, it is also possible to cover the rolls or modify the jig so that the ends of the roll do not cool off more than the inside and cut down the affinity of the color at the edges. It must be borne in mind that most of the dyeing takes place actually on the roll. On the other hand, padding methods could be employed, and *it would be simple to devise equipment producing uniformity of temperature across the width of the fabric.*" [Italics are supplied.]

It is not necessary for us to discuss all the exhibits or to quote extensively from the testimony. The Board has gone into this matter at great length and since we are in agreement with its conclusion that priority was properly awarded to the appellees it would serve no useful purpose to here restate in detail the attempts shown in appellees' voluminous record to prove reduction to practice. We will content ourselves with calling attention to certain features of the same, following in part this court's practice in Hamer v. White et al., 143 F.2d 987, 31 C.C.P.A., Patents, 1186.

Much controversy has arisen concerning Platt and Croft Exhibits 5 and 5A, the former being a drawing, a duplicate of which was marked by a witness (Gibbs) called by Platt and Croft in order to identify its parts, which marked drawing became Exhibit 5A. It was upon these exhibits largely that the Board found that appellees had reduced the invention of the count to practice on March 7, 1938. The drawing may be described as an end view of a vat jig over which there is a complete cover with the exception that at each end thereof there is shown, at the bottom, a cut-out portion where a portion of the roll, when it contained a large amount of cloth, could be viewed from the outside. Inside of said cover was located a heating pipe which extended from the bottom to near

the top of the cover and across the same. The cover represented by said Exhibits 5 and 5A was junked by appellees and was not produced in evidence.

It is the view of the appellant, strongly stressed, that to perform the function of the count in a patentable sense it was necessary that the entire top of the jig be covered and that a suitable regulative heating unit, such as a perforated steam pipe, should be arranged within the cover in such manner as to afford sufficient heat, together with the heat from the heated bath, to insure that each roll of cloth, when out of the bath, should be maintained at substantially the same temperature as that of the bath, and that appellees' testimony is not satisfactory to show that at any time prior to or on March 7, 1938, appellees operated said device in any other way than with open ends and an imperforated pipe which would not emit heat.

The Board found that there was some confusion on this phase of the case, but it quoted part of the junior party's testimony as showing that the open spaces at the ends were at times fully closed and that flaps were furnished over said openings and the Board stated that the heating system utilized by the appellees, although not clearly described in the record, was shown to have afforded the required amount of heat.

It is true that the drawing in controversy discloses the open ends and does not indicate a perforated pipe, but there is sufficient proof in the record to show that on March 7, 1938, and prior thereto, the said device had been operated with a completely closed hood and a proper heating pipe. As we have stated before, the evidence on this subject is in places contradictory and somewhat confusing, but we cannot say that the finding of the Board is clearly contrary to the weight of the evidence and that by such evidence appellees did not prove a complete reduction to practice of the invention on the date specified.

Other exhibits relating to events occurring between March 7, 1938, and the date of the filing of the appellees' application, June 14, 1938 (most of which no doubt was introduced for the purpose of showing diligence if diligence was required), are shown in the record of the appellees. These exhibits, for the most part, relate to records showing dyeing operations in which certain temperatures, dyeing effects, and types of covered jigs used were disclosed. The Board did not comment on these exhibits

since it found that appellees had completely reduced to practice on March 7, 1938, and it is not necessary for us to consider them any more than to say that they show a continuity of effort up to the time of the filing of the application in perfecting their system and dyeing cloths which went into the market as commercial articles. Since we are of the opinion, for the reasons stated, that we must affirm the Board's action in awarding appellees the March 7th, 1938, date as their actual date of reduction to practice it will be unnecessary for us to further discuss the other exhibits introduced by the appellees.

Appellant has urged with great earnestness that Platt and Croft Exhibit 24, the Whitehead letter, and other facts in the record relating to oral disclosures and other acts of the parties concerned show that appellees, on or prior to the 7th of March, 1938, were concerned only with the problem of providing a means of keeping the temperature of the selvages, while the fabric was on the rolls, outside the vat, substantially equal to that within the vat and that they did not have in mind keeping this same relation of the temperatures as affecting the portion of the rolls of cloth between the selvages. Appellant stresses the importance of maintaining substantially the same degree of heat in the center of the roll as at the selvages in order that the color may be uniform throughout and urges that appellees relied wholly upon the padding effect of the rolls of cloth to hold the interior portion of the rolls at an even temperature. It is true that there is some suggestion in the record that appellees had some notion that the high degree of temperature required might bring about a so-called "stretching," but regardless of this consideration, if appellees' witnesses are to be believed, and we see no reason why they should not, the center of the rolls of cloth were, during said tests, kept at a temperature substantially the same as that of the bath, and whether or not appellees originally feared the so-called stretching effect or felt it unnecessary to give special consideration to the heating in the center of the roll is an immaterial matter.

In passing it is not improper to say that whether or not the testimony and exhibits relating to the appellees' activities in the period following March 7, 1938, to June 14, 1938, were important to appellees, a reading of the testimony of the witnesses with reference to these dates and an examination of

the exhibits confirms the belief that prior to the appellant's filing date (which, as we herein hold, is the earliest date which could be given to appellant) the appellees were in full possession of the invention and had successfully reduced it to practice.

Appellant contends that if appellees' evidence relating to anything subsequent to March 7, 1938, is given any consideration that he has shown that he reduced to practice on March 12, 1938. Since we have just referred to those portions of appellees' record relating to happenings subsequent to March 7, 1938, for purposes which are obvious and although it was not necessary to do so in view of our conclusion, we think it proper that we give consideration to appellant's contention that his record discloses proof of reduction to practice prior to his filing date. As before stated, the Board gave no consideration to Kenyon's record.

Kenyon's record consists of the testimony of his above-named five witnesses and certain exhibits to some of which brief reference will be made. Kenyon Exhibits 1 and 2, dated February 24 and 28, 1938, show purchases of dyestuff. Kenyon Exhibits 5, dated March 9, 1938, shows that "Erlanger," a customer of Kenyon's company, gave Kenyon permission to use 123.5 yards of Erlanger's cloth to make a test run. This batch of fabric is further identified by Kenyon as Exhibit 6, which is dated March 8, 1938. Curtis testified that on March 9, 1938, Kenyon suggested to him "that we use a covered jig," and stated that the covered jig was made between the 9th and 12th of March, 1938. Certain fabrics which Curtis stated were dyed on March 14, 1938, on said jig were introduced in evidence and were by Curtis said to be "perfect." The jig was said to contain a Weston thermometer and there was a Foxboro Dial thermometer to record the temperature of the dye bath itself. It is not clearly disclosed by the testimony in what manner the jig was closed or to what extent, and the record is not convincing as to the details of and exact location of the heating unit. There was some testimony which was to the effect that the jig was completely enclosed and that the hood contained two perforated steam pipes yet there was such uncertainty as to dates as to throw doubt on the value of all the testimony.

The so-called covered jig was not introduced into evidence and is stated to have been destroyed by storm. No other records relating to the operation of the jig made on or about the time it was supposed to have been operated were introduced, allegedly because of their destruction in said storm, nor was any testimony with reference to any pertinent labor records made on or about the critical period introduced in evidence.

Appellant's testimony and that of his witnesses relating to the performance of the jig was orally adduced several years after the supposed happening of the events and it is not convincing that on or prior to appellant's filing date he had reduced the invention of the involved count to practice. Other phases of appellant's record to which appellant's counsel has called our attention are not regarded as of sufficient importance to require consideration here.

In closing and in reference to the Kenyon record we think it proper to say that regardless of the fact as to whether or not there may be spelled out from it statements to the effect that a closed jig with a proper heating element was used in producing the desired result on or before appellant's filing date we think that his record as a whole lacks probative effect since the testimony was given long after the events were supposed to have happened and not aided, for the most part, by any documentary exhibits or the dyeing jig allegedly used. In fact, appellant here devotes little space in his brief to the importance of his record, and we are clearly of the opinion that it fails to meet the requirements of his case.

There is but one other issue we are called upon to discuss and decide. Appellant contends, contrary to the holding of the Board, that he has proven that the jig upon which Platt and Croft rely for reduction to practice on March 7, 1938, was inoperative to perform such a successful operation as to meet the requirements of the count. It is pointed out by the Board, and we think properly, that appellant, in its operation of what it regarded as a duplicate of the device illustrated in Platt and Croft Exhibit 5 in an effort to prove inoperativeness, failed to prove inoperativeness of the device for the reason that "he did not test a completely closed hood provided with an imperforate steam coil. It may be noted that, although in the Kenyon record and brief there is an attempt to show that an imperforate steam pipe is inoperative, an enclosed heater (such as a steam coil) is the primary suggestion in the Kenyon application which is directly involved in this interference. The party

Kenyon has failed to prove the inoperativeness of the operation carried out by Bergeron on March 7, 1938."

A showing that proper results could not be obtained without covering the ends which were open and using a perforated pipe does not prove that an imperforate pipe would not conduct sufficient heat if the ends were closed. The Board has found, and we concur in its view, that appellees have shown that the structure upon which they reduced to practice on March 7, 1938, not only provided heat above the dye bath of substantially the same temperature as the heated dye bath, but also had a hood, the ends of which were closed.

It follows from the foregoing that the Board of Interference Examiners properly awarded priority of invention of the involved count to the junior party, Platt and Croft, and its decision so doing is affirmed.

Affirmed.